UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

                               :

SHAI BEN-LEVY,

                               :

                Plaintiff,

                               :        Consol. Case No. 11-cv-1554 (KBF)

           - against -

                               :

BLOOMBERG, L.P.; and TONY TANG,
DOMENIC MAIDA and PRAMIT SHAH,     :
Individually and in their capacities as Managers
at Bloomberg, L.P.,                     :

               Defendants.      :

----------------------------------------------------------x

<u>DEFENDANTS' MEMORANDUM OF LAW</u>
<u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ....................................................................................................................... 1

STATEMENT OF FACTS .......................................................................................................... 2

    A.    Ben-Levy Receives Fluctuating Compensation Awards and Exhibits Performance Problems Prior to Turning 40 and Taking Leave. ............................ 2

    B.    Bloomberg Makes Every Effort to Accommodate Ben-Levy's Heart Problems Following His First Medical Leave. ........................................................ 3

    C.    Ben-Levy Accepts a Position in Credit Derivatives. .................................................. 4

    D.    Ben-Levy Experiences Performance Problems in Credit Derivatives. .................... 4

    E.    Ben-Levy Transfers to the Message Compliance Department. ............................... 5

    F.    Ben-Levy Continues to Perform Poorly. .................................................................. 5

    G.    Ben-Levy Moves to an Individual Contributor Role. ............................................... 7

    H.    Ben-Levy's Claims. .................................................................................................... 8

ARGUMENT ............................................................................................................................... 8

I.    NONE OF BEN-LEVY'S DISCRIMINATION CLAIMS CAN SURVIVE ..................... 9

    A.    Ben-Levy Cannot Establish a Prima Facie Case ...................................................... 9

        1.    Ben-Levy Is Not Disabled Under the ADA ............................................. 10

        2.    There Is No Evidence of Discriminatory Animus .................................... 10

        3.    Many of the Decisions at Issue Are Not Adverse .................................... 15

    B.    Bloomberg Had Legitimate Reasons for Each Employment Decision ................. 17

    C.    Ben-Levy Cannot Show Pretext, Given the Absence of "Overt Evidence of Discrimination." .................................................................................................... 19

II.    THE RETALIATION CLAIMS FAIL UNDER McDONNELL DOUGLAS ................. 21

III.    MANY OF BEN-LEVY'S CLAIMS ARE TIME-BARRED ........................................... 22

IV.    BEN-LEVY'S TITLE VII, STATE AND CITY LEAVE CLAIMS, AND STATE
COMMON LAW CLAIMS FAIL ................................................................................. 23

    A.    Ben-Levy's Title VII Claim Fails. ................................................................... 23

    B.    Ben-Levy's Leave Claims Under the HRLs Fail. ............................................. 23

    C.    Ben-Levy's Intentional Infliction of Emotional Distress Claim Fails. ............ 24

    D.    Ben-Levy's Quantum Meruit and Unjust Enrichment Claims Also Fail .......... 24

V.    THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS FAIL ......................... 24

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

Cases                                                                                    Page(s)

*Abrams v. Bloomberg L.P.*, No. 09 Civ. 6537(DAB) (S.D.N.Y. Mar. 27, 2012)........................13

*Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442 (S.D.N.Y. 2002) .........................14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................8

*Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393(RJS), 2010 WL 2813632
  (S.D.N.Y. July 12, 2010) ......................................................................................................13, 21

*Batac v. Pavarini Construction Co.*, No. 03 Civ. 9783, 2005 WL 2838600 (S.D.N.Y.
  Oct. 27, 2005) ............................................................................................................................10

*Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236 (S.D.N.Y. 2001) ......................................17

*Bernard v. JP Morgan Chase Bank NA*, No. 10-0710-cv, 2011 WL 326513 (2d Cir. Feb.
  3, 2011) ................................................................................................................................12, 20

*Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095 (S.D.N.Y. 1997) ........................................13

*Castaldo v. N.Y.C. Board Of Education*, 166 F.3d 1199 (2d Cir. 1998) ......................................23

*Castro v. N.Y.C. Bd. of Educ. Pers.*, No. 96 Civ. 6314(MBM), 1998 WL 108004
  (S.D.N.Y. Mar. 12, 1998) .....................................................................................................15, 16

*Colon v. Trump Intern. Hotel & Tower*, No. 10 Civ. 4794, 2011 WL 6092299 (S.D.N.Y.
  Dec. 7, 2011)...............................................................................................................................11

*D'Amico v. City of N.Y.*, 132 F.3d 145 (2d Cir. 1998) ...................................................................8

*Daniels v. Federal  Reserve Bank of Chi.*, No. 98 C 1186, 2006 WL 861969 (N.D. Ill.
  Mar. 31, 2006).............................................................................................................................14

*Darrell v. Con Edison*, No. 10 Civ. 1866(KBF), 2012 WL 398488 (S.D.N.Y. Feb. 7,
  2012) ............................................................................................................................................9

*DeWitt v. Lieberman*, 48 F. Supp. 2d 280 (S.D.N.Y. 1999) ........................................................25

*Dixon v. International Federation of Accountants*, No. 10-1924-cv, 2011 WL 1086867
  (2d Cir. Mar. 25, 2011) ...............................................................................................................18

*El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931 (2d Cir. 2010)...............................................20, 21

*Escribano v. Greater Hartford Academy of Arts*, No. 09-4553-cv, 2011 WL 4001030 (2d Cir. Sept. 9, 2011) ................................................................................................19

*Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004) .......................................................25

*Ferraro v. Kellwood Co.*, 440 F.3d 96 (2d Cir. 2006) ......................................................9

*Flynn v. N.Y. State Division of Parole*, 620 F. Supp. 2d 463 (S.D.N.Y. 2009) .............15

*Galabya v. N.Y.C. Board of Education*, 202 F.3d 636 (2d Cir. 2000) ...........................16

*Govia v. Century 21, Inc.*, 140 F. Supp. 2d 323 (S.D.N.Y. 2001) ..................................22

*Hannon v. Kiwi Services*, No. 10 CV 1382, 2011 WL 7052795 (N. D. Tex Dec. 30, 2011) ........21

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) .........................................................11

*Hirschberg v. Bank of America, N.A.*, 754 F. Supp. 2d 500 (E.D.N.Y. 2010) ..............12

*Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x. 647 (2d Cir. 2011) ........................22

*Hollander v. America Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990) .................................14

*Hughes v. Pacienza*, No. 11424/09, 2011 WL 4861841 (Sept. 22, 2011) .....................24

*Jacques v. DiMarzio, Inc.*, 386 F.3d 192 (2d Cir. 2004) ...............................................10

*Jeffrey v. Met Logistics, Inc.*, No. 07-CV-3301, 2009 WL 674349 (N.D. Ill. Mar. 13, 2009) ..................................................................................................................20

*Kaur v. N.Y.C. Health & Hospitals Corp.*, 688 F. Supp. 2d 317 (S.D.N.Y. 2010) ......15

*Lanier v. I.B.M. Corp.*, 319 F. Supp. 2d 374 (S.D.N.Y. 2004) ........................................9

*Lee v. Healthfirst, Inc.*, No. 04 CV 8787, 2007 WL 634445 (S.D.N.Y. Mar. 1, 2007) ................14

*Leget v. Henderson*, No. 99 CIV 3636, 99 CIV 4610, 2001 WL 43615 (S.D.N.Y. Jan. 18, 2001) ................................................................................................................16

*Levion v. Societe Generale*, No. 09 Civ. 5800, 2011 WL 4549458 (S.D.N.Y. Sept. 30, 2011) ....................................................................................................................24

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898 (2d Cir. 1997) ...................................23

*Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121 (E.D.N.Y. 2002) ..................17

*Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381 (S.D.N.Y. 2011) ..........17

*McDermott v. New York City Housing Development Corp.*, No. 10 Civ. 2029, 2011 WL 167836, (S.D.N.Y. Jan 18, 2011)..............................................................................11, 12, 20

*McKenzie v. Meridian Capital Grp.*, 829 N.Y.S. 2d 129 (N.Y. App. Div. 2006) ..................23, 24

*McIntyre v. Longwood Central Sch. District*, 658 F. Supp. 2d 400 (E.D.N.Y. 2009)..................17

*Nathe v. Weight Watchers Int'l*, No. 06 CV 4154 (DAB), 2010 WL 3000175 (S.D.N.Y. July 26, 2010)......................................................................................................................8, 17

*O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (U.S. 1996)................................13

*Olle v. Columbia University*, 332 F. Supp. 2d 599 (S.D.N.Y. 2004) ...........................................18

*Peters v. Mount Sinai Hospital*, No. 08 Civ. 7250(CM), 2010 WL 1372686 (S.D.N.Y. Mar. 30, 2010)........................................................................................................................1, 19

*Platt v. Inc. Village of Southampton*, 391 F. App'x 62 (2d Cir. 2010)...........................................8

*Potenza v. City of N.Y.*, 365 F.3d 165 (2d Cir. 2004) ....................................................................8

*Quintero v. Rite Aid of N.Y., Inc.*, No. 09 Civ. 6084(JLC), 2011 WL 5529818 (S.D.N.Y. Nov. 10, 2011) ..........................................................................................................................10

*Ramos v. Piller, Inc.*, No. 07 Civ. 4047(SCR)(JFK), 2009 WL 3401261 (S.D.N.Y. Oct. 21, 2009) ....................................................................................................................................19

*Rebele v. Potter*, No. 09-CV-2441, 2011 WL 2134268 (E.D.N.Y. 2011)....................................23

*Ricks v. Conde Nast Publ'ns., Inc.*, 92 F. Supp. 2d 338 (S.D.N.Y. 2000) ..............................20, 21

*Ruby v. Springfield R-12 Public Sch. District*, 76 F.3d 909 (8th Cir. 1996) ...............................10

*Sampson v. City of N.Y.*, No. 07 Civ. 2836(BSJ)(RLE), 2009 WL 3364218, (S.D.N.Y. Oct. 19, 2009) ....................................................................................................................... 19

*Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000)................................................................. 13

*Sheridan v. New York Life Inv. Mgmt., LLC*, No. 09 Civ. 4746(KBF), 2012 WL 474035 (S.D.N.Y. Feb. 9, 2012)....................................................................................................8, 9, 11

*Smith v. Morton Intern., Inc.,* Number 09 1050(EFM), 2011 WL 768747 (D. Kan. Feb. 28, 2011) ...................................................................................................................................15

*Soileau v. Gilford of Maine, Inc.*, 928 F. Supp. 37 (D. Me. 1996) ...............................................19

*Tappe v. Alliance Capital Management L.P.*, 177 F. Supp. 2d 176 (S.D.N.Y. 2001).............10, 11

*Taylor v. Virginia Union University*, 193 F.3d 219 (4th Cir. 1999)..............................................20

*Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003) ........................................................8, 9

*Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995) ....................................................24

*Vandenbroek v. PSEG Power CT LLC*, 356 F. App'x 457 (2d Cir. 2009) ...............................9, 18

*Watson v. Arts & Entertainment Television Network*, No. 04 Civ. 1932, 2008 WL 793596 (S.D.N.Y. 2008) ......................................................................................................8

*Weeks v. New York State (Div. of Parole)*, 273 F.3d 76 (2d Cir. 2001) ........................................17

*Wills v. Pennyrile Rural Elec. Coop. Corp.*, 259 F. App'x 780 (6th Cir. 2008)............................14

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ....................................................11, 21

*Yarde v. Good Samaritan Hospital*, 360 F. Supp. 2d 552 (S.D.N.Y. 2005)................................22

## STATUTES

N.Y.C. Admin. Code § 8-107 ............................................................................23, 24

N.Y. Exec. Law § 296(a) ...............................................................................23, 24

29 U.S.C. § 626................................................................................................22

29 U.S.C. § 633................................................................................................22

29 U.S.C. § 2617..............................................................................................23

42 U.S.C. § 2000e............................................................................................23

42 U.S.C. § 12117............................................................................................22

Defendants Bloomberg, L.P. ("Bloomberg" or the "Company"), Tony Tang, Domenic Maida and Pramit Shah (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment.

## INTRODUCTION

Shai Ben-Levy's claims are premised on the type of "fallacious syllogism seen in so many discrimination cases":[1] he is a member of a protected class, he suffered an unwelcome employment action, therefore he must have suffered that action because he is member of a protected class.  Such hollow logic is not enough to withstand summary judgment.

Ben-Levy claims that Bloomberg immediately started discriminating against him when he turned 40 and continued to discriminate against him the following year because he took medical leave for heart problems.  According to Ben-Levy, Bloomberg harbors such animus against people in their early 40s and people with heart conditions that it has been on a discriminatory warpath to sabotage his career ever since.  His theory is as baseless as it sounds.

Ben-Levy is a longtime Bloomberg employee with strong technical skills, but poor management capabilities.  Rather than work to improve those deficiencies, he grew defensive, bitter and withdrawn.  His negative attitude exacerbated his shortcomings, and ultimately cost him his managerial responsibilities.  Unhappy with how his career has turned out, Ben-Levy overlooks his various deficiencies and assumes that Bloomberg's decisions can only be attributed to his age, alleged disability or medical leave.  But there is no evidence to support that speculation.

---

[1] *Peters v. Mount Sinai Hosp.*, No. 08 Civ. 7250(CM), 2010 WL 1372686, at *1 (S.D.N.Y. Mar. 30, 2010) (To show a PDA violation, it is not enough to say "I was fired; I was pregnant when I was fired; therefore, I was fired because I was pregnant.").

Ben-Levy brought this case without any evidence of discrimination, and he remains devoid of any such evidence after months of discovery.  He admits that no one at Bloomberg ever made any statements concerning his age, alleged disability or leave.  Indeed, the evidence demonstrates that rather than discriminate against Ben-Levy, Bloomberg went out of its way to accommodate him.  Defendants are entitled to summary judgment on all of Ben-Levy's claims.

## STATEMENT OF FACTS[2]

A.      **Ben-Levy Receives Fluctuating Compensation Awards and Exhibits Performance Problems Prior to Turning 40 and Taking Leave.**

Ben-Levy is a current Bloomberg employee who joined the Company in 1990 as a software developer in the Research and Development ("R&D") department.  (56.1 Stmt. ¶ 1, 24.)  In or around May 2001, at age 35, Ben-Levy became manager of the systems department ("Systems").  (*Id.* ¶¶ 2, 25.)

Beginning well before Ben-Levy turned 40, developed his heart problems and took medical leave, his compensation awards regularly fluctuated and he received negative performance feedback.  (*Id.* ¶ 26-29.)  In or around October 2005, Ben-Levy's direct supervisor, Shawn Edwards, who had only recently started managing him, identified Ben-Levy as a weak performance manager and expressed disappointment with both his performance and attitude.  (*Id.* ¶ 29-30.)  In February 2006, Mr. Edwards gave Ben-Levy a candid performance review that criticized his management of weaker performers.[3]  (*Id.* ¶ 31.)  This critique occurred approximately seven months prior to his first medical leave.  (*Id.* ¶ 40.)

---

[2] For a full recitation of the undisputed material facts, Defendants respectfully refer the Court to Defendants' Rule 56.1 Statement of Material Facts ("56.1 Stmt.").

[3] Bloomberg requires managers to engage in performance management to identify weaker team members who need improvement and stronger team members who may be candidates for advancement.  (*Id.* ¶ 9.)  Emphasis on

**B.    Bloomberg Makes Every Effort to Accommodate Ben-Levy's Heart Problems Following His First Medical Leave.**

Ben-Levy took medical leave from September 19, 2006 to November 13, 2006 for heart problems (the "First Leave").  (*Id.* ¶ 40.)  Upon his return, he resumed his managerial role in Systems.  (*Id.* ¶ 42.)  However, Ben-Levy told Bloomberg that he could no longer consistently work normal hours because he needed to attend cardiac rehab three days a week and because he was struggling with stress and fatigue.[4]  (*Id.* ¶¶ 45, 50, 57.)  These self-imposed limitations further diminished Ben-Levy's ability to discharge his managerial responsibilities—managers at his level generally are required to work full-time and be on-call after normal working hours, and at the time the Company did not allow flexible work arrangements.  (*Id.* ¶¶ 8, 49-50.)  Nevertheless, Bloomberg made an exception for Ben-Levy and let him work an ad hoc part-time schedule.  (*Id.* ¶¶ 45-48, 59.)  And in February 2007 – less than three months after Ben-Levy returned from leave, and at age 41 – Bloomberg gave him a $15,000 raise.  (*Id.* ¶¶ 2, 42, 43.)

It soon became clear, however, that Systems could not function properly without a full-time manager focused on performing well.  (*Id.* ¶ 59.)  Ben-Levy's team began to fall behind, and he continued to exhibit a negative attitude and poor performance management skills.  (*Id.* ¶¶ 52-54.)  In April 2007, members of Bloomberg's Human Resources ("HR") department discussed with Ben-Levy other ways in which the Company could assist him.  (*Id.* ¶¶ 56-62.)  He was permitted to choose among three options: continuing as head of Systems (if he was willing to resume full-time hours); transitioning to a more flexible and less stressful role that required a

---

performance management is crucial to sustaining Bloomberg's competitive environment and is one of the Company's core values.  (*Id.*)

[4]Between November 13, 2006, when Ben-Levy returned from his first medical leave, and April 27, 2007, when he went on his second medical leave, he worked 93 days, averaging just 5.5 hours per day.  (56.1 Smt. ¶ 47.)  In contrast, during the 93 working days immediately preceding his first leave, he worked an average of 8 hours per day.  (*Id.*)  Similarly, he worked for 8 hours or more on only 4 of the 93 days between his two leaves, whereas he worked for 8 hours or more on 50 of the 93 days immediately preceding his first leave.  (*Id.* ¶ 48.)

skilled software developer; or taking medical leave at 100% pay.  (*Id.* ¶¶ 60-62.)  He chose the final option and began a second disability leave at full pay on April 30, 2007 (the "Second Leave").  (*Id.* ¶¶ 63-65.)  Company policy provided that employees receive full pay for their first 12 weeks of medical leave and then 60% thereafter.  (*Id.* ¶ 66.)

     **C.**    **Ben-Levy Accepts a Position in Credit Derivatives.**

        When Ben-Levy returned from leave on or around October 27, 2007, he was still manager of Systems.  (*Id.* ¶ 68.)  However, while he was on leave, the R&D department underwent a reorganization in which many managers shifted positions based on their relative strengths and weaknesses.  (*Id.* ¶ 67.)  Bloomberg explained to Ben-Levy that, in line with that reorganization, and because of his continued desire for a less stressful and more flexible position, they would transition him to a new role that would be mutually beneficial to both him and the Company.  (*Id.* ¶¶ 70-72.)  Ben-Levy met with several managers in the Company to explore available opportunities.  (*Id.* ¶ 74.)  Following those meetings, he accepted a team leader position in Bloomberg's credit derivatives group ("Credit Derivatives") and was replaced as manager of Systems by Martin O'Brien, who was 49 years old at the time.  (*Id.* ¶¶ 76-79.)  Approximately six weeks later, Ben-Levy began managing Credit Derivatives, a move he considered a promotion.  (*Id.* ¶ 84.)

     **D.**    **Ben-Levy Experiences Performance Problems in Credit Derivatives.**

        It soon became clear that Ben-Levy's managerial shortcomings carried over into his new position.  (*Id.* ¶ 91.)  Jacqueline Meyer, Ben-Levy's new manager in Credit Derivatives, observed that his performance management skills were lacking and that he was not "aggressive enough with his teams in terms of managing poor performance as well as stretching better performers."  (*Id.* ¶ 92.)  Ms. Meyer was primarily responsible for drafting Ben-Levy's 2008

year-end review, which criticized his performance management.  (*Id.* ¶¶ 93-94.)  Ben-Levy

testified that Ms. Meyer did not discriminate against him.  (*Id.* ¶ 100.)

### E.    Ben-Levy Transfers to the Message Compliance Department.

In or around 2009, the R&D department was reorganized, and many employees

changed roles.  (*Id.* ¶¶ 101-104.)  Mr. Tang, who oversaw the reorganization, regarded it as an

opportunity to address Ben-Levy's performance management deficiencies by placing him in

charge of message compliance ("Message Compliance").  (*Id.* ¶¶ 108-109.)  That role required

less performance management and more hands-on work with computer hardware, which Mr.

Tang viewed as a better match for Ben-Levy's skill set.  (*Id.* ¶ 110.)  Ms. Meyer "immediately"

agreed with Mr. Tang's assessment and believed that the switch would be a "good opportunity"

for Ben-Levy to "focus on his strengths instead of his weaknesses."  (*Id.* ¶ 111.)

### F.    Ben-Levy Continues to Perform Poorly.

Soon after Ben-Levy joined Message Compliance, he was put in charge of an e-

mail storage and retrieval initiative called the Bloomberg Vault ("B Vault") project.  (*Id.* ¶¶ 123,

125.)  Bloomberg viewed it as an important initiative with the potential to be a significant new

revenue source.  (*Id.* ¶ 124.)  Despite the importance of this project, Ben-Levy conclusoraly (and

implausibly) alleges that Mr. Tang, along with Ben-Levy's new managers Pramit Shah and Bob

Plotts, conspired to derail the project to discriminate against him.  (*Id.* ¶ 126.)

Within Ben-Levy's first few months in the group, Mr. Shah began to give him

feedback that mirrored the performance criticisms identified by his previous managers, including

Ms. Meyer (whom Ben-Levy admits did not discriminate against him).  (*Id.* ¶¶ 100, 117-118.)

Mr. Shah echoed the now-familiar criticism that Ben-Levy inadequately managed members of

his team and failed to give them proper performance evaluations.  (*Id.* ¶¶ 117-118.)  Another

more senior manager, Mr. Plotts (who is older than Ben-Levy), expressed similar concerns and described Ben-Levy's behavior as "deliberately insubordinate." (*Id.* ¶¶ 119-122.)

Consequently, in or around October 2009, Mr. Tang and Mr. Plotts decided Ben-Levy should be removed from his role as project manager of B Vault and his team leader position. (*Id.* ¶ 129.) However, because of Ben-Levy's long tenure with the Company, HR believed that he should be given more time to prove himself in the role. (*Id.* ¶ 130.) As a result, on November 5, 2009, Ben-Levy was given a performance plan specifying areas in which he could improve, including performance management. (*Id.* ¶¶ 131-133.) But Ben-Levy's performance continued to decline. He submitted a written project plan for the B Vault project that lacked sufficient detail, contained estimates of project lengths that were overinflated, and that Mr. Tang considered "completely ineffective." (*Id.* ¶¶ 135-138.) Indeed, Jamie Hartsell, the business relationship manager for B Vault, believed that Ben-Levy was doing such a poor job managing the project that she was concerned the project could ruin her own career. (*Id.* ¶ 139.) Ben-Levy admits that Ms. Hartsell did not discriminate against him. (*Id.* ¶ 140.)

Soon thereafter, while Ben-Levy was on leave for hernia surgery in the second half of December 2009 (the "Third Leave"), Wilson Hung assumed management responsibilities for B Vault. (*Id.* ¶¶ 134, 141.) Mr. Hung had exceptional technical and project management abilities. (*Id.* ¶ 142.) In addition, Mr. Hung drafted a project plan that Ms. Hartsell and others considered to be better than Ben-Levy's. (*Id.* ¶ 143.)

When Ben-Levy returned from leave, he resumed his role within Message Compliance and on the B Vault project. (*Id.* ¶ 144.) However, after receiving a "Needs Improvement" 2009 year-end review as well as another written performance warning in February 2010, it became clear to Mr. Tang and Mr. Plotts that Ben-Levy should be removed from the

project.  (*Id.* ¶¶ 145-147, 155.)  Mr. Hung took over the B Vault project on or around February

24, 2010.  (*Id.* ¶ 154.)

On February 22, 2010, following the performance warning, Ben-Levy submitted a

formal complaint to HR in which, for the first time, he claimed discrimination.  (*Id.* ¶ 152.)

Bloomberg conducted an investigation, and after interviewing nine of Ben-Levy's former

managers and colleagues and Ben-Levy over the course of several weeks, the Company

concluded that there was no evidence to support his complaint.  (*Id.* ¶ 153.)  There is no evidence

that Mr. Tang or Mr. Plotts were aware of his complaint when they removed him from the B

Vault project.  (*Id.* ¶ 156.)  Ben-Levy took another leave related to his heart problems shortly

after he submitted his complaint to HR (the "Fourth Leave").  (*Id.* ¶ 157.)

**G.    Ben-Levy Moves to an Individual Contributor Role.**

Ben-Levy concedes that, following his removal from the B Vault project, his

performance remained substandard.  (*Id.* ¶¶ 158-159.)  Mr. Plotts and Mr. Shah concurred, and

Ben-Levy once again received a review of "Needs Improvement" in his 2010 interim review.

(*Id.* ¶ 163.)  In or around September 2010, in an effort to address the now long-standing pattern

of deficiencies related to his performance management and negative attitude, Ben-Levy was

moved out of his team leader role and into a senior software engineer position as an individual

contributor in the derivatives group.  (*Id.* ¶¶ 164-165.)  Today, Ben-Levy remains in an

individual contributor role at Bloomberg.  (*Id.* ¶ 172.)  He received a Total Intended

Compensation award of $255,000 in the beginning of 2012.[5]  (*Id*. ¶ 169.)

---

[5] See Paragraph 18 of Defendants' Rule 56.1 Statement for a definition of Total Intended Compensation.

### H.   Ben-Levy's Claims.

Ben-Levy alleges that Bloomberg discriminated against him (and, in some instances, retaliated against him): (1) by moving him from Systems to Credit Derivatives in the end of 2007; (2) by moving him from Credit Derivatives to Message Compliance in March 2009; (3) by removing him as the project manager of B Vault in February 2010; and (4) by moving him from Message Compliance to an individual contributor role in September 2010. (*Id.* ¶¶ 74-76, 102, 154, 164.)  Ben-Levy also alleges that his compensation awards and performance reviews from 2006 to present were discriminatory.  Finally, he contends that he was improperly subjected to heightened scrutiny in the B Vault role.

## ARGUMENT

The time has come for Ben-Levy to "put up or shut up."  *Nathe v. Weight Watchers Int'l*, No. 06 CV 4154 (DAB), 2010 WL 3000175, at *3 (S.D.N.Y. July 26, 2010).  To defeat summary judgment, Ben-Levy "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [his] version of the events is not wholly fanciful."  *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998).  Because Ben-Levy cannot point to "significant probative evidence tending to support the complaint," Bloomberg is entitled to summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The *McDonnell Douglas* burden-shifting analysis governs Ben-Levy's ADEA, ADA, and FMLA claims, as well as his related state and city claims ("HRL" claims), and his retaliation claims.[6]  Ben-Levy bears the initial burden of producing evidence sufficient to support

---

[6] *Sheridan v. New York Life Inv. Mgmt., LLC*, No. 09 Civ. 4746(KBF), 2012 WL 474035, *4 (S.D.N.Y. Feb. 9, 2012) (Forrest, J.) (ADEA and HRL claims); *Potenza v. City of N.Y.*, 365 F.3d 165 (2d Cir. 2004) (FMLA); *Watson v. Arts & Entm't. Television Network*, No. 04 Civ. 1932, 2008 WL 793596 (S.D.N.Y. 2008) (ADA); *Platt v. Inc. Village of Southampton*, 391 F. App'x 62 (2d Cir. 2010) (ADA retaliation); *Terry v. Ashcroft*, 336 F.3d 128, 142

a prima facie case of discrimination or retaliation by demonstrating that he is a member of a protected class, that he is qualified for the position, that he suffered an adverse employment action, and that the circumstances of that adverse employment action give rise to an inference of discrimination. *Darrell v. Con Edison*, No. 10 Civ. 1866(KBF), 2012 WL 398488, at *5 (S.D.N.Y. Feb. 7, 2012) (Forrest, J.). If (but only if) he satisfies that burden, the burden then would shift to Bloomberg to "'articulate a legitimate, clear, specific, and non-discriminatory reason' for its adverse employment decision." *Lanier v. I.B.M. Corp.*, 319 F. Supp. 2d 374, 380 (S.D.N.Y. 2004) (internal citations omitted). Upon Bloomberg's production of such evidence, the burden would shift back to Ben-Levy to show that Bloomberg's explanation was a pretext for discrimination.[7] *Id.*

## I.     NONE OF BEN-LEVY'S DISCRIMINATION CLAIMS CAN SURVIVE.

Ben-Levy cannot meet his burden under *McDonnell Douglas* because (1) he cannot establish a prima facie case with respect to any employment decision at issue; (2) Bloomberg had legitimate, non-discriminatory business reasons for all such decisions; and (3) there is no evidence that such reasons are pretexts for discrimination.

### A.     Ben-Levy Cannot Establish a Prima Facie Case.

Ben-Levy cannot establish a prima facie case (1) with respect to his ADA claim, because he is not disabled; (2) on any of his claims, because there is no evidence of discriminatory animus; and (3) with respect to his claims related to his moves from Systems to

---

(2d Cir. 2003) (ADEA retaliation); *Vandenbroek v. PSEG Power CT LLC*, 356 F. App'x 457 (2d Cir. 2009) (FMLA retaliation); *Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006) (HRL retaliation).

[7] Under the ADEA and the NYSHRL, Ben-Levy can only meet this burden if he can show that age discrimination was the "but-for" cause of the adverse employment action. *Sheridan*, 2012 WL 474035, at *5. His NYCHRL claim "requires age to be only a 'motivating factor' for the adverse employment action, rather than the 'but-for' cause." *Id.* (internal citations omitted).

Credit Derivatives and from Credit Derivatives to Message Compliance, because the employment decisions in question are not adverse.

1.     Ben-Levy Is Not Disabled Under the ADA.

Ben-Levy is not disabled within the meaning of the ADA.   There is no evidence that Ben-Levy's heart problems substantially limit any of his major life activities.  *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 201 (2d Cir. 2004).  The only basis for his claim that he is disabled is that he was hospitalized in September 2006 and February 2010 to receive treatment for heart problems and that he took medical leave in connection with those hospitalizations.  (*See* Golden Decl. Ex. 14 at ¶¶ 15(a)-(d).)  However, hospitalization without more is insufficient to establish disability under the ADA.  *See Batac v. Pavarini Constr. Co.,* No. 03 Civ. 9783, 2005 WL 2838600, at *5 (S.D.N.Y. Oct. 27, 2005) (holding that employee was not disabled where he was temporarily hospitalized following a heart attack but could subsequently perform all major life activities "with care"); s*ee also Quintero v. Rite Aid of N.Y., Inc.*, 2011 WL 5529818,  at *16 (S.D.N.Y. Nov. 10, 2011).  Because Ben-Levy is not disabled under the ADA, he is not in a "protected class."  Therefore, he cannot state a prima facie case with respect to his ADA claims.

2.     There Is No Evidence of Discriminatory Animus.

Ben-Levy also cannot state a prima facie case with respect to any of his age, leave or disability claims because there is no evidence of discriminatory animus.  Antidiscrimination laws do not authorize "courts to 'sit as a super-personnel department that reexamines an entity's business decisions.'"  *Ruby v. Springfield R-12 Pub. Sch. Dist.*, 76 F.3d 909, 912 n.7 (8th Cir. 1996) (internal citation omitted).  An employer may take an adverse employment action "for any reason as long as [it] is non-discriminatory even if based on reasons that are 'unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility.'"  *Tappe v. Alliance Capital Mgmt. L.P.*, 177 F. Supp. 2d

176, 185 n.9 (S.D.N.Y. 2001).  To make a prima facie case, Ben-Levy must show that the

alleged action occurred under circumstances giving rise to an inference of discrimination.  He

cannot do so.

(a)      *There Is No Evidence of Age-Based Animus.*

Ben-Levy cannot establish age-based discriminatory animus because there is no

evidence that any of the decision-makers was aware of Ben-Levy's age, and Ben-Levy does not

(and cannot) suggest otherwise (and there is no reason for the Court to assume they were aware,

because Ben-Levy turned 40 the year the Company allegedly started discriminating against him).

(56.1 Stmt. ¶ 191.)  *See, e.g., Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005)

(dismissing age discrimination claim where decision-maker was unaware of plaintiff's age

because "discriminatory intent cannot be inferred, even at the prima facie stage, from

circumstances unknown to the defendant") (emphasis removed).  This compels dismissal of his

ADEA and HRL claims.

Moreover, Ben-Levy admits that no one at Bloomberg made any negative

comments about his age, let alone a remark linking an employment decision to his age.[8]  (56.1

Stmt. ¶ 190.)  *See Colon v. Trump Intern. Hotel & Tower*, 2011 WL 6092299, No. 10 Civ. 4794,

at*9 (S.D.N.Y. Dec. 7, 2011) (finding that the absence of any discriminatory comments

weakened plaintiff's claim).

In addition, an older employee replaced Ben-Levy as Systems manager.  (56.1

Stmt. ¶¶ 78-79.)  *See, e.g., McDermott v. New York City Housing Development Corp.*, No. 10

---

[8] The only two comments Ben-Levy identified do not concern him, and, in any event, do not reflect discriminatory animus.  (56.1 Stmt. ¶¶ 37-38, 85-86.)  One comment refers to years of service at Bloomberg and is not aged-biased.  *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993).  The other is a passing reference to age that was not directed at Ben-Levy or any employment decision involving him.  *Sheridan v. New York Life Inv. Mgmt., LLC*, No. 09 Civ. 4746(KBF), 2012 WL 474035, at *7 (S.D.N.Y. Feb. 9, 2012) (Forrest, J.) (holding that a stray remark unconnected to alleged discriminatory act could not support an inference of discriminatory animus).

Civ. 2029, 2011 WL 167836, at *5 (S.D.N.Y. Jan 18, 2011) (where plaintiff was replaced by an employee who was also a member of the protected class, it "provide[d] assurance that no age-based discrimination took place").

Furthermore, Ben-Levy's allegation that he was discriminated against because he refused to "manage out" older employees fails to establish discriminatory animus. According to Ben-Levy, he was asked to "manage out" employees both under and over 40. (56.1 Stmt. ¶¶ 177-188.) Even accepting his allegation that Bloomberg has a policy of getting rid of underperforming employees by "managing" them out, according to Ben-Levy that policy was applied equally to both older and younger employees. (*Id.*) Consequently, this allegation cannot establish bias against older employees. *See Bernard v. JP Morgan Chase Bank NA*, No. 10-0710-cv, 2011 WL 326513, at *3 (2d Cir. Feb. 3, 2011) (no discrimination where member of protected class treated similarly to members outside of protected class).

Nor can Ben-Levy establish age-based discriminatory animus here with comparative evidence; indeed, that evidence actually *negates* any inference of animus. Ben-Levy's claim that his 2006 compensation decrease was based on his having turned 40 is contradicted by the fact that one of Ben-Levy's colleagues with the same direct manager and job title, who turned 60 in 2006, received a $27,000 *increase* that same year. (56.1 Stmt. ¶ 35.) Another colleague who also had the same direct manager and job title, and who turned 46 that year, received a $55,000 increase. (*Id.* Stmt. ¶ 36.) This positive treatment of employees older than Ben-Levy undermines any inference of age-based animus. *See, e.g., Hirschberg v. Bank of America, N.A.*, 754 F. Supp. 2d 500, 517 (E.D.N.Y. 2010) (evidence that other members of the protected class were treated favorably "undercuts" plaintiff's discrimination claim).

Finally, a variety of other evidence rebuts any inference of age-based animus:

- Ben-Levy received the largest pay increase of his career – an increase of over $100,000 – in the year prior to which Bloomberg allegedly started discriminating against him because of his age. *See generally O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (U.S. 1996) (an inference of age discrimination "cannot be drawn from the replacement of one worker with another worker insignificantly younger").

- After Bloomberg allegedly began discriminating against Ben-Levy based upon his age, Ben-Levy received three separate pay increases and what he considers a promotion. (56.1 Stmt. ¶¶ 43, 84, 87, 148.) *See, e.g., Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095, 1104 (S.D.N.Y. 1997) (regular salary increases and bonuses undercut age discrimination claim).

- One of the key decision-makers, Mr. Plotts, is older than Ben-Levy. *See, e.g., Baguer*, 2010 WL 2813632, at *16 (even under NYCHRL's "more liberal" standard, the fact that decision makers were members of the protected class undercut discrimination claim).

- From 2009 through 2011, Ben-Levy was the oldest (or second oldest) and highest paid member of his team. (56.1 Stmt. ¶¶ 98, 150, 168.) *Boyle*, 949 F. Supp. at 1104 (S.D.N.Y. 1997).

Without evidence of age-based animus, Ben-Levy cannot establish that any decision occurred under circumstances giving rise to an inference of discrimination. Therefore, he cannot state a prima facie case under the ADEA or HRLs.

(b)     *There Is No Evidence of Leave or Disability-Based Animus.*

Ben-Levy admits that no one has ever made any negative comments concerning his leave or alleged disability, and he offers no evidence that anyone at Bloomberg ever made a negative remark about employees who take medical leave or are disabled. (56.1 Stmt. ¶ 190.) These admissions undermine his leave and disability-based claims. *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000).

Moreover, Ben-Levy offers no comparative evidence suggesting that he was treated differently because of his leave or heart condition. *See, e.g., Abrams v. Bloomberg L.P.*, No. 09 Civ. 6537(DAB), at *14 (S.D.N.Y. Mar. 27, 2012) (no prima facie showing where

plaintiff failed to offer comparative evidence); *Lee v. Healthfirst, Inc.*, No. 04 CV 8787, 2007 WL 634445, at *12 (S.D.N.Y. Mar. 1, 2007) (same).

Further, while close temporal proximity may, in some circumstances, give rise to an inference of discrimination, most of the alleged adverse actions here are too far remote (in some cases by a period of over a year) from Ben-Levy's medical leaves to give rise to an inference of discrimination. For example: Ben-Levy's 2009 compensation award occurred over a year after his Second Leave; his move from Credit Derivatives to Message Compliance occurred 18 months after his Second Leave; and his move from Message Compliance to an individual contributor role occurred over six months after his Fourth Leave. *See Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002) (three-month delay between protected activity and adverse action insufficient); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (four-month delay insufficient).

Finally, the evidence shows that, rather than discriminate against Ben-Levy, Defendants went out of their way to support him during and after his medical leaves:

- After Ben-Levy returned from his First Leave, the Company allowed him to work an ad hoc, part-time schedule in order to attend cardiac rehab during business hours, even though a part-time schedule was inconsistent with his job responsibilities and Bloomberg did not have a part-time policy at that time.[9] (56.1 Stmt. ¶¶ 8, 45-48, 59.)

- Bloomberg paid Ben-Levy his full salary during the entirety of his six-month-long leave, after paying him his full salary for all eight weeks of his First Leave earlier that year. In doing so, Bloomberg excepted Ben-Levy from its usual policy, which provided that a employee would receive only 60% of his salary after his first 12 weeks of leave. (*Id.* ¶¶ 64-65.)

---

[9] Bloomberg was not required to allow Ben-Levy to work part-time. *See Wills v. Pennyrile Rural Elec. Coop. Corp.*, 259 F. App'x 780 (6th Cir. 2008) (requiring employee to work the regular hours of her job does not constitute an adverse employment action); *Daniels v. Fed. Reserve Bank of Chi.*, No. 98 C 1186, 2006 WL 861969 (N.D. Ill. Mar. 31, 2006) (employer's refusal to allow flex-time does not constitute an adverse employment action).

- After returning from both his First and Second Leaves, Ben-Levy's Total Intended Compensation increased by approximately $15,000 and $10,000, respectively.  (*Id.* ¶¶ 43, 87.)  He received another pay increase in 2010.  (*Id.* ¶ 148.)

- By Ben-Levy's own account, Bloomberg promoted him after his Second Leave.  (*Id.* ¶ 84.)

Such positive treatment seriously undermines Ben-Levy's baseless allegations of leave and disability-based animus.  *Smith v. Morton Intern., Inc.,* No. 09 1050(EFM), 2011 WL 768747, at *5 (D. Kan. Feb. 28, 2011) (finding no inference of discrimination where plaintiff was allowed to transfer to a higher paid position after he was diagnosed with alleged disability).

Without evidence of leave or disability-based animus, Ben-Levy cannot establish that any decision occurred under circumstances giving rise to an inference of discrimination. Therefore, he cannot state a prima facie case under the FMLA, ADA or HRLs.

3.   Many of the Decisions at Issue Are Not Adverse.

With respect to many of Ben-Levy's claims, he fails to state a prima facie case because he does not allege adverse actions.[10]

(a)   *Two of the Key Job Changes at Issue Were Not Adverse.*

To be adverse, an employment action must constitute a "'materially adverse change' in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal citations omitted).  "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action."  *Castro v. N.Y.C. Bd. of Educ. Pers.*, No. 96 Civ. 6314(MBM), 1998

---

[10]Each claim must independently state an adverse employment action.  "[T]here is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim." *Kaur v. N.Y.C. Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).

WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (internal citations omitted).  Ben-Levy must present *objective* evidence that a job change was in fact adverse; his own opinions as to the "difference in prestige levels" between two positions is not enough.  *Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d 463, 485–86 (S.D.N.Y. 2009).

Ben-Levy cannot establish that his moves from Systems to Credit Derivatives[11] and from Credit Derivatives to Message Compliance were adverse.[12]  Neither move "result[ed] in a change in responsibilities so significant as to constitute a setback" to his career.  *Galabya*, 202 F.3d at 641.  He retained managerial responsibilities in both positions, and neither move caused him to lose any direct reports.  (56.1 Stmt. ¶¶ 69, 77, 84, 102, 116.)  Furthermore, his Total Intended Compensation increased following each move – by just over $10,000 after moving to Credit Derivatives and almost $28,000 after moving to Message Compliance.  (*Id.* ¶¶ 87, 148.)  Finally, it is undisputed that both roles were important.  (*Id.* ¶¶ 80, 124.)  Credit Derivatives was so high-profile that one of Ben-Levy's colleagues congratulated him on his "promotion."  (*Id.* ¶ 81.)  And in Message Compliance he was in charge of B Vault – "an important project," with "hundreds of millions of dollars" worth of revenue potential, that was approved by the Company's senior-most executives.  (*Id.* ¶ 124.)

      (b)      *The Performance Reviews and Heightened Scrutiny Claims Do Not State Adverse Actions.*

To the extent Ben-Levy brings independent claims based on allegedly discriminatory performance reviews, plans or warnings, those claims fail.  "It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow

---

[11] Ben-Levy was a team leader in Credit Derivatives from December 20, 2007 until February 7,  2008, when he became a manager.  Even if he could establish that his move from the manager of Systems to a team leader within Credit Derivatives was adverse (he cannot), his six weeks as a team leader was too brief to be actionable.  *See Leget v. Henderson*, No. 99 CIV. 3636, 99 CIV. 4610, 2001 WL 43615, at *6 (S.D.N.Y. Jan. 18, 2001).

[12] Defendants do not concede that any decision at issue was adverse.

employees to develop, improve and avoid discipline) is not an adverse employment action."
*Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001). Therefore, "negative evaluations, standing alone without any accompanying adverse results, are not cognizable."
*Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001).

Furthermore, Ben-Levy's allegation concerning "pervasive harassment" as a result of a supposed "shadow" who was assigned to "follow" him fails. *See Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 393 (S.D.N.Y. 2011) ("Excessive scrutiny and close monitoring without more do not constitute adverse employment actions.").

(c)     *Many of the Compensation Claims Do Not State Adverse Actions*.

Three of the alleged discriminatory compensation decisions at issue were compensation increases:  2007, 2008 and 2010. A pay raise is not adverse unless it is lower than those given to similarly situated counterparts. *See McIntyre v. Longwood Cent. Sch. Dist.*, 658 F. Supp. 2d 400, 413 (E.D.N.Y. 2009). These three decisions are not adverse because the comparative evidence shows that Ben-Levy was paid better than almost all of his peers during these years. *See Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121 (E.D.N.Y. 2002) (granting summary judgment for employer where plaintiff did not compare his compensation award to those of similarly situated employees).

**B.     Bloomberg Had Legitimate Reasons for Each Employment Decision.**

Ben-Levy's claims fail for the additional reason that Bloomberg had legitimate, nondiscriminatory reasons for all decisions involving his employment. Bloomberg's "burden at this stage is one of production, not persuasion." *Nathe*, 2010 WL 3000175, at *4.

With regard to the move from Systems to Credit Derivatives, Ben-Levy acknowledged that, in light of his heart problems, the round-the-clock Systems role was too stressful for him. (56.1 Stmt. ¶¶ 57, 73, 58.) And he was unable to fulfill the requirements of the

role due to the ad hoc part-time schedule he worked after returning from his First Leave.  (*Id.* ¶ 50.)  Nothing in the FMLA, ADA, or HRLs requires an employer to keep an employee in a role where he is not meeting or cannot meet the demands of that role.  *See, e.g., Vandenbroek v. PSEG Power CT LLC*, 356 F. App'x 457 (2d Cir. 2009) (rejecting ADA claim where plaintiff was unable to maintain required hours of the job).

Moreover, Ben-Levy's moves from Systems to Credit Derivatives and from Credit Derivatives to Message Compliance were part of wide-ranging restructurings, the goals of which were to better align managers' roles with their strengths.  (56.1 Stmt. ¶¶ 67, 101.)  And in both instances, Bloomberg also took into account Ben-Levy's weak performance management skills.  (*Id.* ¶ 51-55, 110-112.)  Reorganizations and employee performance are legitimate business reasons for employment decisions.  *See, e.g., Olle v. Columbia Univ.*, 332 F. Supp. 2d 599, 616-17 (S.D.N.Y. 2004) ("The restructuring of operations has repeatedly been recognized by the courts as a legitimate, non-discriminatory reason" for employment decisions); *Dixon v. Int'l Fed'n of Accountants*, No. 10-1924-cv, 2011 WL 1086867, at *1 (2d Cir. Mar. 25, 2011) ("deficient work performance" constitutes a legitimate, nondiscriminatory reason).

Ben-Levy's failure to improve his poor management skills – despite receiving written feedback informing him of the need to do so on four separate occasions while managing B Vault – also caused Bloomberg to remove him as B Vault project manager.  (56.1 Stmt. ¶¶ 127-133, 145-147, 151.)  And because his ineffective management persisted after he returned from his Fourth Leave, Bloomberg moved him from a team leader to a software developer role.  (*Id.* ¶¶ 158-164.)

Finally, all of Ben-Levy's compensation awards at issue were based on position and performance.  (*Id.* ¶¶ 19-21.)

In sum, Ben-Levy's consistent, well-documented and substantial managerial shortcomings – which were recognized by individuals whom Ben-Levy admits did not discriminate against him – are legitimate, nondiscriminatory business reasons for all employment decisions at issue.

### C.   Ben-Levy Cannot Show Pretext, Given the Absence of "Overt Evidence of Discrimination."

Finally, Ben-Levy's discrimination claims fail because there is no evidence of pretext.  "When an employer articulates a non-discriminatory performance-based reason for taking adverse action against an employee, courts have consistently held that the wisdom of the decision should not be second-guessed in the absence of any overt evidence of discrimination." *Peters v. Mount Sinai Hosp.*, No. 08 Civ. 7250(CM), 2010 WL 1372686, at *12 (S.D.N.Y. Mar. 30, 2010).   At this stage, "the factual inquiry proceeds to a new level of specificity."  *Ramos v. Piller, Inc.*, No. 07 Civ. 4047(SCR)(JFK), 2009 WL  3401261, at *5 (S.D.N.Y. Oct. 21, 2009) (internal citations omitted).[13]  Ben-Levy must produce "'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by [Defendants] were false, *and* that more likely than not discrimination was the real reason' for the challenged actions."  *Escribano v. Greater Hartford Acad. of Arts*, No. 09-4553-cv, 2011 WL 4001030, at *2 (2d Cir. Sept. 9, 2011) (emphasis added) (internal citations omitted).

Ben-Levy cannot point to any such evidence.  He admits that no one at Bloomberg has ever made any remarks concerning his age, alleged disability or leave.  (56.1 Stmt. ¶ 190.)  Furthermore, he cannot simply rely on the fact that an employment decision occurred after he returned from medical leave because it is well-established that "temporal

---

[13] *See Sampson v. City of N.Y.*, No. 07 Civ. 2836(BSJ)(RLE), 2009 WL 3364218, at *7-8 (S.D.N.Y. Oct. 19, 2009) (even under NYCHRL, plaintiff's "conclusory allegations and speculation" were insufficient to establish pretext).

proximity is insufficient" to show pretext. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933

(2d Cir. 2010). Finally, he cannot show pretext because he received a poor review six month

before his First Leave. *See Jeffrey v. Met Logistics, Inc.*, No. 07-CV-3301, 2009 WL 674349, at

*10 (N.D. Ill. Mar. 13, 2009) (no discrimination where performance concerns predated

announcement of pregnancy).

> With regard to specific decisions:

- He cannot show that Bloomberg's reasons for moving him from Systems to Credit Derivatives were pretexts for discrimination because he was replaced as Systems manager by someone older than him. (56.1 Stmt. ¶¶ 78-79.) *See, e.g., McDermott*, 2011 WL 167836, at *5.

- He cannot demonstrate that Bloomberg's reasons for moving him from Credit Derivatives to Message Compliance were pretexts for discrimination because Bloomberg moved several other employees (including managers) – all of whom were younger than him – to different roles during the same reorganization that precipitated Ben-Levy's move. (56.1 Stmt. ¶¶ 101-107.) *See Bernard v. JP Morgan Chase Bank NA*, No. 10-0710-cv, 2011 WL 326513, at *3 (2d Cir. Feb. 3, 2011) (no discrimination where member of protected class treated similarly to members outside of protected class).

- He also cannot demonstrate that Bloomberg's reasons for that move were pretexts for discrimination because he admitted that his direct manager in Credit Derivatives – who identified the performance issues underlying the move (and who "immediately" concurred with the move) – did not discriminate against him. (56.1 Stmt. ¶¶ 93-94, 100, 111.) *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 231 (4th Cir. 1999) (no inference of discrimination where Plaintiff offered no evidence that two supervisors who corroborated her poor evaluation harbored discriminatory animus).

- He cannot show that Bloomberg's reasons for removing him as the B Vault project manager were pretexts for discrimination because Jamie Hartsell – whom Ben-Levy admits did not discriminate against him – also believed that he was seriously mismanaging the project. (56.1 Stmt. ¶¶ 139-140.) *See Taylor*, 193 F.3d at 231.

- He also cannot show that Bloomberg's reasons for removing him as the B Vault project manager were pretexts for discrimination because that decision was made before Ben-Levy took leave or announced his intention to do so. (56.1 Stmt. ¶¶ 154-157.) *See, e.g., Ricks v. Conde Nast Publ'ns., Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) (granting summary judgment where employer submitted evidence it was taking steps towards plaintiff's termination prior to her engaging in protected activity).

- He also cannot show that the reasons for removing him from project manager of B Vault or moving him from a team leader to an individual contributor were pretexts for discrimination because one of the decision-makers involved in both decisions was older than Ben-Levy.  (56.1 Stmt. ¶ 122.)  *See, e.g., Baguer*, 2010 WL 2813632, at *16.

- Ben-Levy cannot show that the reasons for his 2009 through 2011 compensation awards were pretexts for discrimination because those awards were set by an algorithm.  (56.1 Stmt. ¶¶ 19-21.)  *See Hannon v. Kiwi Services,* No. 10 CV 1382, 2011 WL 7052795 (N. D. Tex Dec. 30, 2011).  And in the only instance in which the Company deviated from the algorithm's recommendation – 2009 – his Total Intended Compensation was *increased* above what the algorithm recommended.  (56.1 Stmt. ¶¶ 96-97.)

- Ben-Levy cannot show that the reasons for his 2012 compensation award were pretexts for discrimination because there is no evidence that this decision was based on anything other than his performance and position.

Because Bloomberg has legitimate, nondiscriminatory reasons for the employment decisions, and Ben-Levy cannot show that any such reasons are pretexts for discrimination, Defendants are entitled to summary judgment on the discrimination claims.

## II.    THE RETALIATION CLAIMS FAIL UNDER *McDONNELL DOUGLAS*.

Ben-Levy's retaliation claims are based on his February 22, 2010 internal complaint.[14]  As a threshold matter, the decision to remove Ben-Levy as the project manager of B Vault was made some three months *before* he even submitted his internal complaint, which negates any inference of retaliatory animus.  (56.1 Stmt. ¶¶ 129, 152.)  *See Ricks*, 92 F. Supp. 2d at 347.  This fact alone compels dismissal of his retaliation claims.  Furthermore, Ben-Levy cannot state a prima facie case of retaliation because there is no evidence that any decision-makers were aware of his complaint.  (56.1 Stmt. ¶ 156.)  *See Woodman*, 411 F.3d at 82.

---

[14] To the extent Ben-Levy claims retaliation based on any other alleged complaints, there is no evidence of such complaints.  And, in any event, those retaliation claims fail for the same reasons discussed in Sections I(A)-(C) above.

Moreover, the only evidence of retaliatory animus that Ben-Levy can offer is temporal proximity with respect to his removal as project manager of B Vault. All other alleged adverse actions occurred at least six months after Ben-Levy submitted his internal complaint and are therefore too far removed in time to state a prima facie case of retaliation. *See Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (three months or more lag between protected activity and adverse action insufficient).

Finally, the retaliation claims fail for the independent reason that, as described in Sections I(B) above, the Company had legitimate non-discriminatory reasons for all of the alleged employment decisions. And the only evidence of retaliatory animus Ben-Levy can offer – temporal proximity – is insufficient to show pretext. *El Sayed*, 627 F.3d at 932.

## III.    MANY OF BEN-LEVY'S CLAIMS ARE TIME-BARRED.

In New York, ADEA and ADA claims must be filed within 300 days of the alleged unlawful practice. 29 U.S.C. § 626(d); 29 U.S.C. § 633(b); 42 U.S.C. § 12117(a); *see also Govia v. Century 21, Inc.*, 140 F. Supp. 2d 323, 325 n.1 (S.D.N.Y. 2001) (ADEA); *Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647 (2d Cir. 2011) (ADA). Ben-Levy filed his EEOC complaint on October 28, 2010. (56.1 Stmt. ¶ 4.) Consequently, he may only seek relief based on conduct that occurred on or after January 1, 2010. That renders the following claims time-barred under the ADEA and ADA: (1) all claims concerning his First Leave; (2) all claims concerning his move from Systems to Credit Derivatives; (3) all claims concerning his move from Credit Derivatives to Message Compliance; (4) the Total Intended Compensation awards for 2006, 2007, 2008 and 2009; and (5) all performance feedback received prior to December 31, 2009.

FMLA claims are subject to a two-year statute of limitations (or three years if the defendant acted willfully), measured from the filing of judicial proceedings – in this case,

October 27, 2010.  29 U.S.C. § 2617(c)(1); 29 U.S.C. § 2617(c)(2).  Consequently, Ben-Levy

may only seek relief based on conduct that occurred on or after October 27, 2008, rendering

time-barred the following claims under the FMLA:  (1) all claims concerning his First Leave; (2)

all claims concerning his move from Systems to Credit Derivatives; (3) the Total Intended

Compensation awards for 2006, 2007 and 2008; and (4) all performance feedback received prior

to October 27, 2008.

   HRL claims must be filed within three years of the alleged discriminatory act.

*See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997); C.P.L.R. § 214(2);

N.Y.C.A.C. § 8-502(d).  Consequently, Ben-Levy may only pursue state and municipal claims

based on conduct that occurred on or after October 27, 2007, rendering time-barred the following

claims under the HRLs:  (1) all claims concerning his First Leave; (2) the Total Intended

Compensation awards for 2006 and 2007; and (3) all performance feedback received prior to

October 27, 2007.

## IV. BEN-LEVY'S TITLE VII, STATE AND CITY LEAVE CLAIMS, AND STATE COMMON LAW CLAIMS FAIL.

### A. Ben-Levy's Title VII Claim Fails.

   Title VII does not prohibit age, leave or disability discrimination.  42 U.S.C.

§ 2000e.  *See also Castaldo v. N.Y.C.  Bd. Of Educ.*, 166 F.3d 1199 (2d Cir. 1998) ("age

discrimination is not cognizable under Title VII"); *Rebele v. Potter*, No. 09-CV-2441, 2011 WL

2134268 (E.D.N.Y. 2011) (disability discrimination does not fall within the ambit of Title VII).

Thus, summary judgment is appropriate on Ben-Levy's Title VII claim.

### B. Ben-Levy's Leave Claims Under the HRLs Fail.

   The plain language of the HRLs does not apply to discrimination or retaliation based on

medical leave.  N.Y. Exec. Law § 296(a); N.Y.C. Admin. Code § 8-107.  *See also McKenzie v.*

*Meridian Capital Grp.*, 829 N.Y.S. 2d 129, 131 (N.Y. App. Div. 2006) (dismissing plaintiff's claim under the NYSHRL because alleged retaliation based on her request for disability leave was not "a practice forbidden by the State or City Human Rights Laws"). Thus, Ben-Levy's leave-based discrimination claims under the HRLs fail.

### C.     Ben-Levy's Intentional Infliction of Emotional Distress Claim Fails.

Claims for intentional infliction of emotional distress are successful "only where the conduct has been so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Hughes v. Pacienza*, No. 11424/09, 2011 WL 4861841, at *7 (Sept. 22, 2011). Ben-Levy's allegations do not even approach this standard, and this claim fails.

### D.     Ben-Levy's Quantum Meruit and Unjust Enrichment Claims Also Fail.

Ben-Levy's quantum meruit and unjust enrichment claims also fail. "[A] plaintiff may not allege that his [ ] employer was 'unjustly' enriched at his expense when the employer compensated the plaintiff by paying him a salary." *Levion v. Societe Generale*, No. 09 Civ. 5800, 2011 WL 4549458, at *13 (S.D.N.Y. Sept. 30, 2011). These claims fail because Ben-Levy was a salaried employee; indeed, the $2.27 million dollars Bloomberg awarded Ben-Levy in Total Intended Compensation over the past six years is clearly sufficient consideration.

## V.     THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS FAIL.

Finally, Ben-Levy claims that Mr. Maida, Mr. Tang and Mr. Shah are individually liable for age and disability discrimination as well as retaliation under the HRLs and the FMLA. (56.1 Stmt. ¶ 3.)

An individual may be liable under the HRLs only if he is an "employer" or "aider and abettor." *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir. 1995); N.Y. Exec. Law § 296(3-a), (3-c); N.Y.C. Admin. Code § 8-107(1)(a), (6). An individual may be liable as an aider

and abettor if he "actually participates in the conduct giving rise to the discrimination." *See Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (internal citations omitted).  An employer's liability must first be established before an individual can be found to have aided and abetted such employer's actions.  *See DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999).  Because Ben-Levy has failed to establish his claims against Bloomberg, his claims that these individuals aided and abetted Bloomberg also fail.

Moreover, if the Court grants summary judgment on Ben-Levy's claims regarding his move from Systems to Credit Derivatives (and all claims prior to that move), summary judgment should also be granted on all claims against Mr. Maida because there is no evidence that he had any involvement in any conduct following that move.  (56.1 Stmt. ¶¶ 89-191.) Similarly, if the Court finds that only Ben-Levy's move from Systems to Credit Derivatives survives this motion (and/or any claims prior to that move), summary judgment should be granted on all claims against Mr. Tang and Mr. Shah because there is no evidence that they were involved in that move or any conduct prior to that move.  (*Id*. ¶¶ 1-88.)  Finally, if the Court finds that only Ben-Levy's move from Systems to Credit Derivatives and his move from Credit Derivatives to Message Compliance survive this motion, then summary judgment should be granted as to all claims against Mr. Shah because there is no evidence that he had any involvement in any conduct until after Ben-Levy moved to Message Compliance.  (*Id.* ¶¶ 1-100.)

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for Defendants on all claims and grant any further relief it deems necessary and proper.

Dated:  April 2, 2012                          WILLKIE FARR & GALLAGHER LLP
        New York, New York


                                               By:_____/s/_____
                                                        Thomas H. Golden
                                                        (tgolden@willkie.com)

                                               Scott S. Rose  (srose@willkie.com)
                                               Andrew Spital  (aspital@willkie.com)
                                               787 Seventh Avenue
                                               New York, New York 10019-6099
                                               (212) 728-8000

                                               Attorneys for Defendants Bloomberg L.P., Tony
                                               Tang, Domenic Maida, and Pramit Shah.